UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

KEVIN FREEMAN,

                        Plaintiff;

    -against-

THE CITY OF NEW YORK,
VINCENT GAMBINO, and NATASHA
LASSALLE;

                        Defendants.

**16 CV 4073 (WFK)(RML)**

**FIRST AMENDED COMPLAINT**

Plaintiff, Kevin Freeman, by his attorneys, Lumer & Neville, hereby alleges upon information and belief as follows:

## PARTIES, VENUE, and JURISDICTION

1.    At all times hereinafter mentioned, plaintiff Kevin Freeman was an adult male resident of Kings County, in the State of New York.

2.    At all relevant times hereinafter mentioned, defendant City of New York ("New York City"), was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including but not limited to, the New York City Police Department ("NYPD") and its employees.

3.    At all relevant times hereinafter mentioned, defendant Gambino was employed by New York City as a member of the NYPD. Gambino is sued herein in his individual capacity.

4. At all relevant times hereinafter mentioned, defendant Natasha Lassalle was employed by New York City as a member of the NYPD. Natasha Lassalle is sued herein in her individual capacity.

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 1983.

6. Venue is properly laid, pursuant to 28 U.S.C. Section 1391, et seq., in the Eastern District of New York, where plaintiff and defendant City of New York reside, and where the majority of the actions complained of herein occurred.

**RELEVANT FACTS**

7. On April 20, 2014, plaintiff was lawfully present near the intersection of Elton Street and New Lots Avenue in Brooklyn, New York.

8. Plaintiff was walking home after he was dropped off by his friends a few blocks away from plaintiff's residence located at 723 Essex Street, Brooklyn, New York.

9. Plaintiff was not engaging in any unlawful conduct, or any conduct that could reasonably be viewed as unlawful.

10. At this time, plaintiff was approached by at least two New York City Police Officers, namely Officer Natasha Lassalle, Shield No. 20461, and Officer Vincent Gambino, Shield No. 31824. Plaintiff was stopped by these two officers of the NYPD; Officer Vincent Gambino uttered a racial slur in an apparent attempt to disparage or provoke plaintiff.

11. Despite the absence of any legal cause or individualized suspicion, plaintiff was thoroughly searched by the two officers at the scene.

12. The search of plaintiff did not yield any drugs, weapons, or any other type of contraband.

13. Despite the continuing absence of probable cause, plaintiff was nonetheless taken into the defendants' custody and transported to a local NYPD station house, believed to be the 75th precinct.

14. Once at the station house, plaintiff was again searched, and again, this second search did not yield any drugs, weapons, or any other type of contraband.

15. After a period of several hours, plaintiff was taken to Central Booking.

16. While at Central Booking, plaintiff was told that he was being charged with public urination.

17. While plaintiff was still in defendants' custody, defendant Vincent Gambino, with the help and complicity of defendant Natasha Lassalle, completed arrest paperwork in which defendant Gambino claimed that he had personally observed plaintiff urinating in public.

18. Defendant Gambino forwarded these false allegations to the Kings County District Attorney's Office ("KCDA") in order to justify plaintiff's arrest and persuade the KCDA to initiate plaintiff's criminal prosecution.

19. These claims were materially false, and the individual defendants knew them to be false at the time they were made.

20. The individual defendants made these fabricated, false, and otherwise misleading claims and accusations at the time of plaintiff's initial arrest and continuously throughout the course of plaintiff's criminal prosecution.

21. After spending several hours at Central Booking, plaintiff was finally arraigned and brought before a judge.

22. All criminal charges against plaintiff were dismissed, and the plaintiff was released from custody.

23. To the extent that defendant Natasha Lassalle did not directly engage or participate in defendant Gambino's above-mentioned misconduct and/or fabrication of evidence against plaintiff, at no time did either one of these defendants, or any other member of the NYPD, take any steps to intervene in plaintiff's arrest, nor did either of them file any corrective statement or make any effort of any sort to withdraw or nullify the false statements they knew defendant Gambino had fabricated and communicated to the KCDA, or otherwise protect plaintiff from further harm caused by defendant Gambino's knowing violation of plaintiff's constitutional rights.

24. Defendants Natasha Lassalle and Vincent Gambino knew and understood that there was insufficient evidence to justify plaintiff's arrest, and notwithstanding such knowledge, defendant Natasha Lassalle failed to take any steps to intercede to correct defendant Gambino's conduct, or otherwise inform supervisory officers within the NYPD or members of the KCDA about defendant Vincent Gambino's unlawful actions.

25. At all times relevant herein, the defendants were acting within the scope of their employment, and their acts were done in furtherance of the City of New York's interests and without legal justification or excuse.

## FIRST CAUSE OF ACTION

(42 USC §1983 Claims for False Arrest and Denial of Fair Trial as to the Individual Defendants)

26. Plaintiff repeats the above-stated allegations as though stated fully herein.

27. The individual defendants willfully and intentionally seized, arrested, and caused plaintiff to be detained without probable cause, or any reasonable basis to believe probable cause existed, or otherwise failed to intervene while fellow officers engaged in this unconstitutional conduct.

28. The individual defendants fabricated and withheld evidence, and misled the KCDA in order to manufacture probable cause for plaintiff's arrest and subsequent prosecution, or otherwise failed to intercede with the KCDA in order to put a stop to plaintiff's unlawful arrest, detention, and prosecution caused by New York City Police Officers' unconstitutional conduct.

29. The individual defendants, individually and collectively, subjected plaintiff to (i) false arrest and unlawful detention, and (ii) denial of due process and the right to a fair trial through the fabrication of evidence, thereby violating, or at least aiding and abetting in the violation of, plaintiff's

5

rights under the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.

30. To the extent that either of the individual defendants did not directly engage in this unconstitutional conduct, each such officer was aware of such conduct by his or her fellow officer, yet he or she consciously and deliberately failed to make any effort, despite ample time and opportunity to do so, to intervene or otherwise put a stop to the aforementioned misconduct and violation of plaintiff's constitutional rights; by remaining silent or otherwise deliberately choosing not to take any meaningful steps to correct this misconduct, the defendant officers violated the plaintiff's constitutional rights.

31. By reason thereof, the individual defendants have violated 42 U.S.C. § 1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, imprisonment and the deprivation of liberty, as well as the loss of his constitutional rights.

**SECOND CAUSE OF ACTION**

(Monell Claim Against the Municipal Defendant)

32. Plaintiff repeats the preceding allegations as though stated fully herein.

33. The individual defendants' false arrest and prosecution of plaintiff, their fabrication of evidence against plaintiff to justify their unconstitutional conduct, and the failure of any defendant officer to intervene or otherwise act to prevent or mitigate the harms being inflicted by their fellow defendant, were carried out in accordance with an existing plan or policy

6

created or otherwise condoned by the municipal defendant designed to increase the number of arrests made without regard to probable cause.

34. The purpose of this policy or plan was to generate large numbers of arrests to help the NYPD create a false impression of positive activity by their officers and to satisfy internal quotas.

35. In addition, members of the NYPD are evaluated, at least in part, on the basis of their "activity" which is measured by the number of arrests made, search warrants secured, and other, similar criteria. Thus, members of the NYPD routinely make arrests and engage in other police activity without sufficient legal cause in order to raise their levels of "activity" and improve the perception of their job performance.

36. The NYPD tracks the number of arrests made by each officer, but in evaluating its officers, does not take into account the outcome of these arrests, even though this information is available to the NYPD. As a result, officers are well aware that (a) they are being evaluated based on, in large part, the number of arrests they make, and (b) their supervisors do not care whether these arrests lead to actual criminal prosecutions, much less convictions.

37. More precisely, under this policy or plan, officers are encouraged or pressured to make as many arrests as possible, which has caused and will continue to cause New York City Police Officers, including, of course, the individual defendants, to make arrests regardless of whether there was any factual basis for the charges.

38. Upon information and belief, the above-cited policy was in existence as of the date of the arrest of the plaintiff herein, April 20, 2014, due to the fact that said policy had been officially memorialized on October 17, 2011, in the Police Officer Performance Objectives Operation Order in which NYPD Commissioner Kelly directed all commands that, "Department managers can and must set performance goals" relating to the "issuance of summons, the stopping and questioning of suspicious individuals, and the arrests of criminals."

39. Upon information and belief, that same "...Operation Order" stated, "uniformed members. . . .Who do not demonstrate activities . . . or who fail to engage in proactive activities . . . will be evaluated accordingly and their assignments re-assessed."

40. In the case of *Floyd v. City of New York*, 813 F. Supp. 2d 417, 448 (S.D.N.Y.) on reconsideration, 813 F. Supp. 2d 457 (S.D.N.Y. 2011), United States District Judge Shira A. Scheindlin denied the municipal defendant's motion for summary judgment, in part, based on evidence that the NYPD had a widespread practice of imposing illegal stop and frisk, summons, and arrest quotas on officers. The evidence cited in *Floyd*, included testimony from various officers, audio recordings of roll call meetings in which precinct commanders issued orders to produce certain numbers of arrests, stops and frisks, and summonses, and said evidence also included a labor grievance on behalf of six officers and one sergeant who were transferred (out of the same 75th Precinct where plaintiff was arrested) for allegedly failing to meet a ten

summons-per-month quota. In January 2006, a labor arbitrator found that this same 75th Precinct had imposed summons quotas on its officers in violation of New York State labor laws.

41.     In another Southern District of New York case, *Schoolcraft v. City of New York*, 10 CV 6005 (RWS), the plaintiff, a police officer assigned to Brooklyn's 81st Precinct alleged that precinct commanders and supervisory personnel expressly imposed arrest and summons quotas. In 2012, Police Officer Craig Matthews commenced *Matthews v. City of New York*, 12 CV 1354 (BSJ) in the Southern District of New York, alleging that his complaints that the existing quota system was leading to unjustified stops and arrests, thereby causing damage to the department's relationship with the local community, led to his termination. There was little dispute that he made these complaints or that they were well founded. See *Matthews v. City of New York*, 779 F.3d 167, 169 (2d Cir. 2015).

42.     That this plan is still in effect is reflected in a class action suit apparently filed in August 2015 by various police officers alleging that the NYPD still requires officers to meet fixed numerical goals for arrests and court summonses each month, according to a New York Times article published February 18, 2016, which can be found online at http://nyti.ms/1R9FCGu.

43.     The policy or plan was kept in effect through the date of plaintiff's arrest, despite the municipal defendant's knowledge that prosecutors were often not charging the individuals arrested, not actively pursuing their prosecution; that there was insufficient evidence to justify the

9

arrests and illegal searches; or that the arresting officers were seeking to bolster the arrests with false allegations, and that the prosecutors often had found insufficient cause to justify the imposition of charges or continued prosecution if charges were filed.

44. According to an article in New York Magazine, dated October 10, 2014, the City of New York issued a report reflecting that it paid an average of $33,875 per case to resolve well over 10,000 cases between 2009 and 2014, and that figure did not take into account filed cases that were still pending when the report was compiled. Similarly, the City Comptroller has reported that the City of New York's payments to resolve allegations of misconduct by members of the NYPD had risen from $99 million to $217 million in between 2005 and 2014, as stated on Page 2 in the Comptroller's August 2015 report at http://nylawyer.nylj.com/adgifs/decisions15/083115claims.pdf. While such numbers relate to the NYPD as a whole, they reflect that the City had actual knowledge that its police department was routinely engaging in unconstitutional and unlawful conduct, at least some of which could reasonably and logically be attributed to the aforementioned quota policy, which policy stressed the need for a specific quantity of arrests, without regard for the quality of evidence supporting probable cause for the arrests.

45. In October 2011, following a bench trial in New York State Supreme Court, Kings County, under Indictment Number 06314-2008, former New York City Police narcotics officer Jason Arbeeny was convicted of "planting" drugs on two individuals, and falsifying arrest reports. Before issuing

a verdict of guilty, the trial judge scolded the NYPD for what the judge described as a "widespread culture of corruption endemic in its drug units." The judge further stated that the testimony demonstrated that the NYPD narcotics divisions maintain a "cowboy culture" and that he was "shocked, not only by the seeming pervasive scope of misconduct but even more distressingly by the seeming casualness by which such conduct is employed."

46.	In an Order dated November 25, 2009, in *Colon v. City of New York*, 09- CV-0008 (E.D.N.Y.), the Honorable Jack B. Weinstein, United States District Judge, stated:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

47.	It is thus manifestly clear through the litigation brought in the Eastern and Southern Districts of New York, as well as the many cases filed in New York State courts, that numerous civilians have alleged that members of the NYPD have deliberately arrested those civilians without probable cause. Thus, even if the municipal defendant was not the architect of the policies and routinized conduct causing these unlawful arrests, The City of New York was

11

certainly on notice of the practice, and by failing to take any meaningful corrective steps, has ratified, endorsed, or otherwise communicated its acceptance of this policy to the officers it continues to employ.

48. Rather than take meaningful steps to reduce and eliminate such misconduct by its officers, the City of New York and the NYPD have instead affirmatively announced a renewed commitment to vigorously defending such misconduct. In an article in the New York Times on February 4, 2016, the link to which is http://nyti.ms/1nPv0mO, the City proudly announced that the NYPD had "created a new 40-member legal unit that develops evidence that the Law Department can use to defend lawsuits against the police, and the [Law Department] hired about 30 lawyers to bolster its litigation teams and to try more cases in court." According to this article, these steps were warmly received by police union leaders.

49. The City's stated response to the wave of litigation caused by misconduct on the part of the NYPD is thus directed not at the deliberate and frequent constitutional violations provoking and fueling the consequential litigation, but rather at defending such indefensible misconduct, encouraging officers to engage in unconstitutional conduct without fear of being sued or held accountable. In so doing, the City of New York has dispensed altogether with any pretense that such misconduct is not endorsed by the City of New York and the NYPD's leaders and supervisory personnel.

50. It is therefore clear that the municipal defendant has not only tolerated, but actively fostered a lawless atmosphere within the NYPD and that

the City of New York, at a bare minimum, has been on notice yet was deliberately indifferent to the risk that the undue emphasis on arrest quotas, or minimum activity levels, particularly when coupled with a deliberately indifferent level of supervision, would lead to the violation of individuals' constitutional rights in general, and cause the violation of plaintiff's rights in particular.

51. By reason thereof, the municipal defendant has violated 42 U.S.C. §1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of his constitutional rights.

**[Remainder of Page Intentionally Left Blank]**

**DEMAND FOR A JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38, plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

WHEREFORE, plaintiff demands judgment against defendants jointly and severally as follows:

i. Actual and punitive damages against each of the individual defendants in an amount to be determined at trial;

ii. Actual damages against the municipal defendant in an amount to be determined at trial;

  iii. Statutory attorney's fees pursuant to, *inter alia*, 42 U.S.C. §1988 and New York common law, disbursements, and costs of the action; and

  iv. Such other relief as this Honorable Court may deem just and proper.

Dated: New York, New York
   February 23, 2017

          Respectfully submitted,

          James Concemore Neville, Esq.
          LUMER & NEVILLE
          *Attorneys for Plaintiff*
          225 Broadway, Suite 2700
          New York, New York 10007
          (212) 566-5060


          By: _____/s/_____
            James C. Neville, Esq.